SOMMERVILLLE, J.
This suit is against Dominick J. Tortorich, the maker of three demand notes, of date February 5, 1908, one for $6,000, a second for $6,000, and a third for $6,573.26. Tbe notes were alleged to bave been secured by 43 shares of the New Orleans Jockey Club, although the witnesses testified there were 127 shares. The suit is also against Samuel F. Heaslip and the commercial firm of Lagarde Bros, and the individual members thereof, Louis G. Lagarde and John E. Lagarde, as indorsers. There was judgment in favor of the plaintiff and against Dominick J. Tortorich and Louis G. Lagarde in solido for the full amount claimed, and there was further judgment in favor of Samuel F. Heaslip and John E. Lagarde and against plaintiff. Plaintiff has appealed.
The plaintiff asks that the judgment in favor of Heaslip be reversed and set aside, and for a judgment against him.
No appeal was taken from the judgment in favor of John E. Lagarde.
[1] The defense of Heaslip was that he had not indorsed his name on the three notes sued upon. It was admitted by plaintiff that tbe burden of proof was upon it.
Six witnesses were offered by plaintiff to testify to the genuineness of the signatures of Heaslip, indorsed on the notes. Tortorich, the maker of the notes, testified that he had never asked Heaslip to indorse the three notes, and only learned that Heaslip’s name was on them after the failure of the Teutonia Bank & Trust Company, in the year 1912; with which bank he (Tortorich) had discounted the notes. The witness had no recollection whatever as to how Heaslip’s name got on the notes; but he recognized the signatures as those of Heaslip.
Louis G. Lagarde, another defendant, testified that he saw Heaslip indorse the notes in question, in the presence of Eugene F. Buhler, the president of the Teutonia Bank & Trust Company. He further testifies that Heaslip asked Buhler to take his name off the notes, and that Buhler said he would do so.
Eugene F. Buhler, president, testified that he was slightly acquainted with the signature of Heaslip, but could not testify clearly on the point. He further says tbht Heaslip asked him to take his name off the notes. He did not know who secured the indorsements of Heaslip, and could remember nothing of the transaction whatever. (Lagarde testified that Buhler had insisted upon Heaslip indorsing the notes, but Buhler could remember nothing about it.)
T. Blum, Jr., paying teller of the bank, *863 states that the signatures are those of Heaslip.
E. J. Braud, note clerk of the bank, could remember nothing about tile notes.
A. D. Mazurette, discount clerk of the bank, says that the signatures do not look like Heaslip’s.
The defendant Heaslip testified that he did not indorse the notes, or any other notes; that he did not borrow money on notes or otherwise; and his testimony is supported by that of Paul J. Maloney, a confidential employe of Heaslip, who testified that the signatures are not those of the defendant Heaslip.
In addition to the above-named witnesses two experts in handwriting were examined; one on behalf of the plaintiff, and the other on behalf of Heaslip. The one called by plaintiff testified that, in his opinion, the signatures were made by the same person who signed other admitted signatures of Heaslip; and the other expert, called by the defendant, testifies that the signatures were not made by the person who made the admitted signatures of Heaslip.
[2] The three signatures on the backs of the three notes sued upon, purporting to be those of Samuel F. Heaslip, are in the record; and we have carefully compared them with the admitted signatures of Samuel F. Heaslip, and have come to the conclusion that the indorsements on the notes were not made by defendant Samuel F. Heaslip.,
[3] The testimony of the two experts is conflicting, and that of one is largely destroyed by that of the other. It has therefore been of little assistance to the court in arriving at a conclusion in the case. A very careful and thorough examination of the signatures on the notes, made in connection with a like examination of Mr. Heaslip’s signatures on certificates of stock, etc., found in the record, discloses certain differences between the two which are not explained by witnesses for plaintiff. The admitted signatures of Heaslip are made with clear and forceful strokes of the pen; while the indorsements on the notes are made with an apparent attempt at ease and force, which takes from the genuine character of the signatures. It is clear that they were intended to be like the original signature of Mr. Heaslip ; and they do resemble it in many particulars; but they are unlike the original in particulars which are needless to be recounted here. The signature of Mr. Heaslip is that of a careful business man, while the indorsements on the notes appear to be imitations.
Plaintiff undertook to show why Heaslip had indorsed the notes for Tortorich, and the time of his having done so. In these efforts, the plaintiff failed. When defendant offered evidence to rebut that testimony, it was objected to on the ground that collateral matters, testified to for plaintiff, could not be contradicted. Plaintiff opened the door for the introduction by defendant of such evidence, if it was collateral; and defendant’s evidence to rebut was properly admitted.
Mr. Tortorich and Mr. Lagarde, both defendants in this suit, testified that about the time of the making of the notes sued upon, and just prior thereto, say, within 30 days, shares of stock of the New Orleans Jockey Club had been bought by them for the purpose of pooling their interests, so as to get control of the club; and that the notes had been issued for the purpose of paying for the shares of stock bought at that time; and that as Mr. Heaslip, the president of the club, might become interested in the pool, Mr. Buhler, the president of the bank with which the notes had been discounted, and the shares of the Jockey Club stock had been pledged, asked Lagarde to have Heaslip indorse the notes; and that Mr. Buhler, the president of the bank, who was also interested in the pool, could not indorse the notes discounted in his own bank; and, as Mr. Heaslip knew *865 the stock to be worth from $200 to $250 per share, that he would be willing to indorse the notes, and that he did indorse them in the presence of Mr. Buhler and Mr. Lagarde, although Mr. Buhler could not remember the circumstances, and Mr. Tortorich testified that he did not know that Mr. Heaslip’s name was on the notes.
The evidence shows that Mr. Heaslip was not interested in the alleged pool; that he had ample fortune to pay cash for any stock that he might have wanted; and that he was trying to sell the stock which he owned.
When the books of the bank and the Jockey Club were produced, and it was shown that the notes sued upon were renewal notes of Mr. Tortorich, that the money resulting from the discount of them did not go for the payment of stock purchased within 30 days before the date of said notes, and that Tortorich had not acquired any Jockey Club ’ stock within 30 days of that date, then Tortorich changed his former testimony, and said that he had been buying stock for some time back with a view of forming a pool, and that he had borrowed money from the bank for the purpose of paying for the stock during a long time prior to the making of the notes, and that the notes sued on were discounted to pay the bank the money thus borrowed. But, in this he was contradicted by the books of the bank, going to show that he had not borrowed money from the bank during that time for such purpose. The certificates of stock which Tortorich says he bought with a view of forming a pool were put into the names of himself and others; some of them were bought subsequent to the date of the notes; so that it was made clear that the notes sued upon were renewals of other similar notes for the same amounts, which had been previously discounted by Tortorich at the bank; and that the proceeds of these notes did not go towards the paying for stock purchased by Tortorich for the purpose of forming a pool just prior to or for some time prior to the issuance of the notes. When Tortorich was recalled to the witness stand by plaintiff, he denied that he had testified that the money derived from the three notes was used by him, Lagarde, and Buhler for the purpose of buying stock, which stock was bought within 30 days, or about that time, of the making of the notes; and, when convinced that he had so testified, he stated that he had been in error, that the stock was bought long before; although some of the stock bore dates subsequent to the date of the notes. He contradicted Mr. Lagarde, who had testified to the same effect; and he contradicted Mr. Buhler’s testimony, saying that he, Buhler, had no interest in the stock at all; and he admitted that the money was not gotten on the notes for the purpose of buying stock at, or about, the date of the notes, and that the notes were renewals of notes on which Mr. Heaslip’s indorsements did not appear. The testimony on behalf of plaintiff is so contradictory and destructive of itself that it'cannot be relied upon in any particular. Witnesses for plaintiff contradict themselves, and they contradict one another. They cannot be believed when they say that Mr. Lagarde saw Mr. Heaslip indorse the notes in the presence of Mr. Buhler, when Mr. Buhler testified that he had no recollection whatever of any such circumstance. And, when the three witnesses say that the indorsements are in the handwriting of Mr. Heaslip, they cannot be believed. And they cannot be believed when they say that Mr. Heaslip was willing to indorse the notes because he knew that the stock was ample security on the notes, and that he would run no risk; for the evidence is that he (Heaslip) knew that the security was not worth one-half the money that the witnesses testified it was worth, at the time that it was given as security on the notes. He (Heaslip) knew this, for he was the owner of a large quanti *867 ty of stock in the Jockey Olub, and he had, in less than a month before that time, offered it for sale for less than one-half what the witnesses testified it was worth; and he sold his stock very shortly after the notes were issued, at par; that is, $100.
Our brother of the district court had before him the notes sued upon and the genuine signatures of Mr. Heaslip; he saw the witnesses, and heard them testify; and he came to the conclusion that the notes sued upon did not bear the indorsements of the defendant, Heaslip.
[4] If the judgment appealed from was prematurely signed, and the judge after-wards permitted plaintiff to file and argue a motion for a new trial, no harm was done plaintiff, and such erroneous signing is not a reversible error.
[5] The ruling on the motion for a new trial, based on newly discovered evidence, will not be disturbed. The evidence was merely cumulative; and it was discretionary with the trial judge to grant or refuse the motion. No error or arbitrariness in the rulings of the judge is disclosed in the record.
Judgment affirmed.
MONROE, O. J., takes no part. O’NIELL, J., concurs in the decree.